**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CARLOS ARROYO | : | |
| | : | |
| Appellant | : | No. 736 EDA 2019 |

Appeal from the Judgment of Sentence Entered September 14, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0009217-2016

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CARLOS ARROYO | : | |
| | : | |
| Appellant | : | No. 738 EDA 2019 |

Appeal from the Judgment of Sentence Entered September 14, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0009218-2016

BEFORE: BENDER, P.J.E., OLSON, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED: APRIL 23, 2021**

Appellant, Carlos Arroyo, appeals from the aggregate judgment of sentence of 72 to 152 years' incarceration, imposed after he was convicted of committing multiple sexual offenses against two minor, female victims, including rape, involuntary deviate sexual intercourse with a person less than

---

[*] Retired Senior Judge assigned to the Superior Court.

16 years of age, and aggravated indecent assault of a child. After careful review, we affirm.

In the trial court's Pa.R.A.P. 1925(a) opinion, it presented an extremely detailed summary of the evidence presented at Appellant's trial, which we adopt herein. *See* Trial Court Opinion (TCO), 5/12/20, at 1-28. We only briefly note that Appellant was convicted of the above-stated offenses, as well as endangering the welfare of a child and corruption of minors, based on evidence that he sexually assaulted his two female nieces, K.G. and J.G., on numerous occasions over the course of five years, beginning when K.G. was nine years old and J.G. was five. Appellant was sentenced on September 14, 2018, to the aggregate term set forth, *supra*.[1] Appellant filed a timely post-sentence motion, which was denied by operation of law. He then filed a timely notice of appeal at each docket number,[2] and he complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court filed its Rule 1925(a) opinion on May 12, 2020.

Herein, Appellant states four issues for our review:

> A. Whether the evidence at trial was insufficient to sustain the Commonwealth's burden with respect to all of the charges?

---

[1] For Appellant's convictions relating to each victim, he received an aggregate sentence of 37 to 74 years' incarceration. The court then imposed those aggregate sentences to run consecutively, totaling 72 to 152 years' incarceration.

[2] This Court issued a *per curiam* order consolidating Appellant's two appeals on August 24, 2020.

     B. Whether the verdict was against the weight of the evidence[,] as [Appellant] was of good character[, and he] produced credible testimony that he did not commit the instant offenses?

     C. Whether the Commonwealth's failure to provide [Appellant] and his trial counsel with the text messages prior to trial (whether intentionally, mistakenly, or negligently) denied [Appellant] of both federal and state procedural and substantive due process rights and the effective advice of counsel?

     D. Whether the trial court abused its discretion by imposing a sentence that was manifestly excessive, failed to consider the Sentencing Code criteria[,] and violated both the federal and … Pennsylvania Constitutions?

Appellant's Brief at 6 (unnecessary capitalization omitted).

In Appellant's first issue, he purports to challenge the sufficiency of the evidence to sustain his convictions. In particular, Appellant argues that the jury should have deemed the two victims in this case incredible, as they were "upset and appeared often confused" when testifying. *Id.* at 14. Additionally, he contends that the victims were unbelievable because they "were unable to disclose specific dates and times that the incidents occurred," and they "waited years to disclose" the abuse. *Id.* at 15. Appellant also stresses that there was "no corroborating physical evidence" to support the victims' claims and, when Appellant's house was searched by police, they "did not recover guns, alcohol bottles or pornographic materials[,] as had been testified to by the [victims]." *Id.*

Appellant's arguments attacking the victims' credibility go to the weight, not the sufficiency, of the evidence. *See Commonwealth v. Gaskins*, 692 A.2d 224, 227 (Pa. Super. 1997) (stating that "credibility determinations are

made by the fact finder and that challenges thereto go to the weight, and not the sufficiency, of the evidence"). Thus, we do not review the merits of Appellant's sufficiency claim. *See Commonwealth v. Sherwood*, 982 A.2d 483, 492 (Pa. 2009) (citing *Commonwealth v. Small*, 741 A.2d 666, 672 (Pa. 1999) (stating that an appellate court will not review a sufficiency claim where the argument in support goes to the weight, not the sufficiency, of the evidence)).[3]

In reviewing Appellant's remaining three issues, we have closely examined the certified record, the briefs of the parties, and the applicable law. Additionally, we have considered the thorough opinion of the Honorable Anne Marie B. Coyle of the Court of Common Pleas of Philadelphia County. We conclude that Judge Coyle's well-reasoned decision accurately disposes of the final three claims presented by Appellant. *See* TCO at 36-38 (discussing the weight of the evidence to support Appellant's convictions); *id.* at 14-17 (summarizing the context in which certain text messages between Appellant and the victims' father were admitted into evidence); *id.* at 38-46 (explaining why the admission of the at-issue text messages was proper); *id.* at 46-53 (rejecting Appellant's claim that the sentence imposed was an abuse of the court's discretion). Accordingly, we adopt Judge Coyle's opinion as our own,

---

[3] In any event, we would agree with the trial court's detailed discussion of how the Commonwealth's evidence was sufficient to sustain Appellant's convictions. *See* TCO ta 28-36. Thus, we would deny him relief on his first issue, even had he presented a proper sufficiency argument for our review.

and affirm Appellant's judgment of sentence for the reasons set forth therein. We direct the parties to attach a copy of Judge Coyle's opinion to this memorandum in the event of further proceedings.

Judgment of sentence affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/23/21

Received 8/28/2020 11:08:44 PM Superior Court Eastern District
Circulated 04/12/2103 AM

Filed 8/28/2020 11:08:00 PM Superior Court Eastern District
MAY 736 EDA 2019

Office of Judicial Records

A01001-21

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA ) | CP-51-CR-0009217-2016 |
| ) | |
| ) | SUPERIOR COURT |
| ) | NO.: 736 EDA 2019 |
| VS. ) | |
| ) | |
| ) | CP-51-CR-0009218-2016 |
| ) | |
| CARLOS ARROYO ) | SUPERIOR COURT |
| ) | NO.: 738 EDA 2019 |

### OPINION

Carlos Arroyo, the above-named Defendant/Appellant, seeks review of the Judgments and Orders of Sentence entered on September 14, 2018, following jury trial, by the Honorable Anne Marie Coyle, Judge of the Court of Common Pleas for the First Judicial District Criminal Division, hereinafter referred to as "this Court." Within his counselled Statement of Matters Complained of on Appeal, filed pursuant to Pa.R.A.P. §1925(b), Appellant claimed insufficiency of evidence and alternatively, that the guilty verdicts had been entered against the weight of the evidence.

Appellant also averred that the trial court had erroneously denied his mistrial motion and denied him due process protection after the prosecution failed to produce text message evidence prior to trial. Finally, Appellant summarily argued that the respective Judgments and Orders of Sentence were manifestly excessive. A full and fair review of the record demonstrated: that no reversible trial error had existed; the convictions for all offenses had been soundly weighted by competent evidence; and that respective Orders of Sentence had been imposed well within the authorized discretion of the trial court.

-1-

## FACTUAL AND PROCEDURAL HISTORY

Appellant's underlying arrest on June 1, 2016 stemmed from the reports provided to law enforcement and to medical professionals at St. Christopher's Hospital on May 18, 2016, that two minor sisters "K.G." and "J. G.," then ages fourteen (14) years and ten (10) years old respectively, had been repeatedly sexually assaulted over a multiple year period by their "Uncle Carlos" later identified as Appellant Carlos Arroyo. The child victims and Appellant had been related through the marriage of Appellant, Carlos Arroyo with the victims' father's sister Maria Guzman Arroyo.

During the preceding five-year time span during which Appellant's countless attacks had reportedly occurred, the victim K.G. was between the approximate ages of nine (9) years and fourteen (14) years and her younger sister J.G. was between the ages of five (5) years and ten (10) years old. Appellant was over fifty years old. Most of the reported assaults had taken place inside Appellant's house that he had shared with his wife, known to the victims as their paternal "Aunt Milly" located at 4615 Shelbourne Street in Philadelphia. At least one of the reported assaults of K.G. had occurred during a weekend family reunion event inside a hotel room in the Pocono Mountains. The children recalled also that they had been forced to view and pose for pornographic photographs while travelling or being parked inside Appellant's truck and in the basement of his home on various dates.

Contact between the victims and Appellant began when the victims' immediate family moved in 2011 from Puerto Rico to Philadelphia area. The victims' family consisted of K.G., J.G., their older brother and their married mom and dad. At that time, Appellant and his wife were childless and as such, inserted themselves as helpful family members and child guardians while the children's parents worked. Appellant assisted the victim's father to obtain refinery employment. During that period "Aunt Milly" and "Uncle Carlos" increasingly invited just the

-2-

two girls K.G. and J.G. to spend weekend overnights at their home located at 4615 Shelbourne Street in Philadelphia. They often would go there to "eat...go to a mall, [and/or] watch a movie." (See Notes of Testimony ("N.T.") 3/28/2018, page ("p.") 29.) The victims shared a spare bedroom in that home. (See also N.T. 3/28/2018, pgs. 103-109.)

Within a very brief period, Uncle Carlos and Aunt Milly showered both girls with gifts including clothes, money and even a cell phone for K.G. Inside his home, Uncle Carlos, who was initially trusted by all family members, systematically groomed each of his child nieces for his sexual gratification. While the children were in their care, both Appellant and his wife reportedly gave K.G. with "Cocoa" flavored alcohol and Nyquil to make her more pliable to his sexual advances. Appellant threatened each child if either disclosed his abuse. Appellant particularly later rewarded K.G. with gifts and money following his sexual assaults.

Each tiny statured victim courageously recounted Appellant's predatory pattern of abuse to law enforcement and medical personnel at St. Christopher's Hospital. Each later provided in-depth video recorded independent accounts to a Philadelphia Child Alliance forensic interviewer and finally to the fact-finding jury while physically facing the Appellant. In summary, during their gut wrenching trial testimony, each child victim spoke of spending overnights at Appellant's home and initially having a positive relationship with Appellant until he started fondling each of them and then quickly progressed to vaginal, anal and mouth penetration with his hands, penis and objects, as well as engaging in other sadistic forms of sexual abuse and exploitation of his status of a trusted care-giver.

K.G., the older of the two girls, remembered that when she was about nine years old, Appellant began his sexual assaults by touching her chest and vagina over her clothes with a backscratcher that he had kept for his leg rashes. (N.T. 3/28/2018 pgs. 34-36). Her younger sister

J.G. similarly testified that Appellant began assaulting her using that same backscratcher when she was about six years old. (N.T. 3/29/2018 pgs. 18-20). J.G. reported a parallel rapid progression from touching private areas to repeated penile penetration of her vagina and forced performance of oral sex upon Appellant's penis. (N.T. 4/2/2018 pgs. 14-30). Each child had also observed some of Appellant's sexual assaults upon each other.

K.G. quietly voiced to the jury her memory of an early attack that had occurred when she was about eight years old at Appellant's Shelbourne street residence. She recalled sitting on the Appellant's couch next to him while his wife was upstairs showering. K.G. stated that while they were watching a movie, he had a backscratcher that he had kept to help his "rash" that he used to "tickle" her. (N.T. 3/28/2018 p. 34) K.G. stated that "Carlos" first used the backscratcher to caress her arm and shoulder, then her breasts, then moved it on top of her vagina, outside of her pants. He rapidly advanced to touching her vagina and breasts under her clothes. He then began routinely inserting his penis and tongue inside her vagina and her mouth. (Id. at pgs. 34-40). He often forced her to perform oral sex upon his penis. (Id. at pgs. 48-49). There were times she had remembered white milk coming from his penis and that it had smelled "disgusting." (Id. at p. 50).

K.G. vividly recalled bleeding vaginally and how much it hurt her inside after Appellant had penetrated her vagina with his penis. (Id. at pgs. 41, 97-98). She spoke of the Vaseline jar that he had kept handy to help ease insertion of his penis. She also recalled being tremendously hurt when he, at least once, penetrated her anus with his penis. (Id. at pgs. 48-51) She stated that her legs went weak with the pain she had endured. (Id. at p. 51) She testified that Appellant had apologized for hurting her so badly after he anally penetrated her with his penis. K.G. graphically described Appellant's penchant for "licking her pussy." (Id. at p. 58) K.G. also physically demonstrated the motions of making Appellant's penis harden and being forced to open her mouth

-4-

for his penis to enter. (Id. at p. 49) She spoke about Appellant's use of Vaseline to assist his penetration of the orifices of her body. (Id. at p. 96) She also remembered that he had often showed her pornographic material on his cell phone while in his vehicle with her younger sister. (Id. at p. 80)

K.G. vividly recollected that "Carlos" had threatened her and told her that if she "ever opened [her] mouth" then he would "blame" her and that no one would "believe" her. (N.T. 3/28/2018 p. 36). She remembered being quite "scared," uncomfortable and confused because at that point she had no knowledge of sex, being only nine years of age. She stated that she could not understand why he was touching her like that. She testified that "Every time Milly—she always take a shower, he always touch me." (Id. at p. 52) K.G. recalled observing similar forms of abuse happening to her sister and her failed attempts to stop him. (Id. at pgs. 57-60) Remarkably, K.G. courageously testified of escalating instances of sexual attacks, too numerous to count or describe occurring over multiple preceding years, and that she and her younger sister J.G., would silently suffer at the hands of Appellant until she reported his assaults in May 2016.

At trial, K.G. detailed the extreme efforts that Appellant had utilized to keep his predatory conduct a secret. In addition to threatening each child with harm if either revealed his abuse, Appellant's wife, their paternal Aunt Milly had plied K.G. with forms of alcohol to make her "dizzy" and compliant. Both children reported that both Carlos and Milly regularly bought each child various articles of clothing and gifts including revealing "booty shorts" that had been prohibited from being worn at home. (Id. at pgs. 52-56)

K.G. stated that Aunt Milly had bought K.G. a phone that Appellant used to continually send text messages promising money and gifts in exchange for her favor. (Id. at pgs. 52-61, 76-80). She recalled that one text message that had been sent by Appellant to her over this phone had

been accidentally intercepted by her mom before the final report of abuse. That message texted in English had contained a promise of money to K.G. When initially questioned by her mom, who could not read English, as to its meaning, K.G. denied anything untoward had been happening. (N.T. 3/28/2018 pgs. 60-61, 76-80) Defense counsel through cross-examination of each witness, including K.G., emphasized the fact that none of those referenced messages particularly sent to K.G. directly had been retained.

Each victim remembered similarly that Appellant would begin by touching them outside clothing, and then advance to removing their clothes and penetrating their vaginas with his fingers, tongue and his penis which would hurt them physically inside their vaginal area. Each child had testified being routinely forced to perform oral sex upon Appellant's penis. K.G. testified at trial that about a week after the first recalled incident with the backscratcher, Appellant had put his hands inside K.G.'s shorts and underwear. Then shortly thereafter, on other occasions, Appellant would undress K.G. and put his penis on top of and then inside her vagina, would use his tongue on her vagina, and other times would force her to open her mouth and he would insert his penis. K.G. would tell Carlos that what he was doing hurt her and would try to move and push him away so that he would stop, but he still continued unrelenting and ever-increasing intensity and demands. (Id. at pgs.41- 87)

The patterned progression and predatory methods of abuse of each child victim were strikingly alike. Both victims reported that most of the attacks had either occurred on Appellant's couch while Aunt Milly was "in the shower" or in his spare bedroom when one or both girls would sleep over and Aunt Milly was sleeping in Appellant's bedroom. (Id. at pgs. 43-45) K.G. stated that Appellant would come into the guest room in the middle of the night when K.G. was asleep to molest her and then nonchalantly exit. (Id.) K.G. remembered vividly that both Carlos and Aunt

-6-

Milly gave her cocoa flavored alcohol and NyQuil which made her "dizzy.' (N.T. 4/2/18 pgs. 68, 85-87).

K.G. recalled how another sexual assault was interrupted by "Aunt Milly" when she and her sister shared a hotel room in the Poconos during and extended family reunion. (N.T. 4/2/18 pgs. 57-58, 92-94). She recollected that Aunt Milly took her younger sister J.G. in the shower with her and left K.G. alone in the bedroom with Carlos. She testified that Aunt Milly had come into the bedroom and interrupted Uncle Carlo's vaginal rape of her under the sheets. (N.T. 3/28/2018 pgs. 57-58) Very often K.G. attempted in vain to protect her sister from being abused by Appellant. (N.T. 3/28/2018 p. 59)

K.G.'s younger sister, J.G. testified at trial with a greater amount of emotionally traumatic difficulty at trial than her older sister. She also however recounted parallel patterns of Appellant's predatory conduct as her sister at trial, to medical personnel, to the Philadelphia Child Alliance forensic interviewer. Likewise, her recorded and videotaped statements provided to the forensic interviewer, to police personnel and to medical personal had been admitted in full at trial. Her earlier interviews provided far more detailed accounts of Appellant's methods of assaults. The video recording of K.G.'s interview with the Philadelphia Child Alliance forensic interviewer was marked and introduced as Commonwealth Exhibit #7A. The video recording of J.G.'s separate forensic interview with the Philadelphia Child Alliance forensic interviewer was marked and introduced as Commonwealth Exhibit #7B. The interviews had been introduced in full to the jury consistent with the agreement of all parties and their respective counsel.

J.G. testified at trial that she and her sister would visit Aunt Milly's when she was about six or seven years old and that they would stay in Appellant's middle bedroom. (N.T. 3/29/2018 pgs. 12-18) J.G remembered that Appellant had started her inappropriately touching different parts

of her body that made her uncomfortable first over her clothes and then under her clothes when she was about seven or eight years.

She stated that he had initiated his attacks with the backscratcher, and described how it became exponentially more explicit and damaging with each repeated instance of abuse. (N.T. 3/29/18 p. 18). She recalled an upsetting incident that had been mentioned by K.G. when Appellant told them that they were going to Walmart and then forced them to go to his basement instead. The basement had been often used by Appellant to display pornographic materials and sexually assault both sisters. J.G. remembered that her older sister K.G. in response had threatened Appellant to tell her dad if he did not return them home. (Id. at pgs. 20-26). She said K.G. refused his demand to go upstairs. At this point during the trial testimony J.G. became hysterical and she could speak no further that day.

Testimony resumed on April 2, 2018 and J.G. informed the jury and this Court that she had been afraid to speak certain words. She used initials to define upsetting terms. For instance, she used "S" for "suck." (N.T. 4/2/2018 p. 10-13). On this date J.G. was able to recount more of Uncle Carlos' sexual attacks upon her as well as those that she had witnessed being inflicted upon her older sister K.G. particularly on her chest and vagina. (Id. at pgs. 14-32). She haltingly described repeated touching and penetration of her own vagina with Appellant's hand and penis. Id at pgs. 14-32).

J.G. also testified at trial that Appellant had shown her pictures of "nude people" when they were in Appellant's truck. (Id. at p. 20). J.G. remembered that "more than ten times" Appellant had revealed his penis to her and would put it on her body and force it into her mouth. She demonstrated how during her acts of defense, J.G. would "put [her] head back, but he would bring it forward." (Id. at p. 29). During defense cross-examination, J.G. recounted her awareness of

Carlos and Milly's pattern of shopping and money and gift giving to the both girls. (Id. at p. 43-46).

J.G. recalled seeing the text messages sent from Appellant to her sister offering money on the phone that Aunt Milly had purchased. (Id. at pgs. 43-46). J.G. confirmed the manner in which the abuse was reported to her parents (Id. at pgs. 46-49). During cross-examination, J.G. recalled seeing Appellant's leg rash, penis and "white stuff come out" from his penis during these attacks. (N.T. 4/2/2018 pgs. 49-51). She also remembered in more detail that she had observed Carlos similarly hurt her sister and that he would make them watch "bad stuff" in his basement. (Id. at pgs. 49-53).

As each child victim became overwhelmed emotionally and sobbed uncontrollably during their testimony in front of the jury composed of adult strangers and Appellant, calming breaks had been employed by this Court out of the presence of the excused jury to provide time for these visibly traumatized children time to recover and continue to testify. The mental harm inflicted upon both children from having to revisit their horrific experiences was self-evident.

The corroborating trial testimony of both victims, their parents, responding law enforcement personnel and the original forensic interviewers revealed that after approximately five years of brazenly exploiting both children as sexual playthings, Appellant's deeds had been finally exposed when K.G. broke down and told her school teacher, counselor and her mother "A.R." about what had been happening to both her and her younger sister J.G. (N.T. 4/2/2018 p. 63).

The testimony from both of the victims' visibly distraught parents demonstrated that everything in their family life had spiraled when K.G. revealed to her mom that their trusted uncle had been "touching" her and her sister in response to the relayed request of Appellant to take K.G. and J.G. to a store. During the period of time preceding the report of abuse, both parents informed

-9-

the jury of the previous positive relationship that each had of their brother-in-law Carlos. Each spoke of the assistance that Carlos and Milly had provided to them when they moved to Philadelphia. They confirmed that the progressive contact between Carlos and Milly with their daughter had seemed to be normal and familial.

Each parent testified that over time however, they had noticed that their older daughter K.G. particularly had negatively changed over at least a two-year period. She went from being a straight "A" student to failing in class, distracted, sullen, often crying and closed off in her bedroom. Both parents recalled becoming very concerned and mystified as to the cause of their daughter's downward spiral and seeking guidance from the school counselor. Specifically, the victims' mom A.R. after confirming the relative dates of birth of her daughters, familial relationships and the progression of contact, recalled that she had picked up her daughters K.G. and J.G. in her vehicle from school one day in early May 2016. She testified that this time when A.R. mentioned as she was driving that Appellant's had asked to take them to the store, K.G. began crying and told her:

> "Mom, don't make me go with uncle. And she started grabbing her. Mom don't make me go with uncle and she started to grab her hand like this and said, don't make me go with uncle. I was driving, I turned around and said, why don't you want to go with your uncle? She said, no, he touched me and she mentioned her sister as well." (N.T. 04/02/2018 p. 64-65) A.R. stated that she had reacted and that "I had to park. I gave her a big hug. I said no, no, no, I can't let you go with him. She started screaming and saying he touched me, he touched my sister, I can't take it anymore."

(N.T. 04/02/2018 p. 65) At that point, mom shouted directly at Appellant as remained seated expressionless across the courtroom: "Why did you do that? Why did you do that? (Id. at p. 65.) A break was taken until mom could compose herself as she had become inconsolable.

When the trial resumed, A. R. testified further that on the day K.G. first revealed the abuse to her in the car, J.G. also started to cry. After she assured them that they were not going with

-10-

Appellant and that she had to tell their father "Poppy." Both girls instantly reacted fearfully because they thought that their dad would scold or hit them. Mom reassured them that their dad would not react that way. (Id. at pgs. 66-67) When they went home, they all spoke together while screaming, hugging and dropping to the floor. (Id. at p.67)

A.R. stated that when her children had begun to disclose details of Appellant's assaults, her husband broke down and started yelling "...stop telling me-stop telling me. He wanted to go to [Appellant's] house. He sat down, he was kind of, he didn't know what to do. He seemed helpless." (Id. at p. 67.) A.R. testified that when K.G. told her some of what had been happening, she initially blurted that Appellant had "touched [her] breasts, vagina stroked [her], tried to kiss [her]... gave her NyQuil to go to sleep... he touched her and thrust her." (Id. at pgs. 67-68) She recalled specifically that K.G. disclosed that Appellant had penetrated her vagina with his penis and promising to do the same to J. G. in the future. She remarked that early on Appellant had complained to K.G. that J.G's vagina was too small to penetrate and that he would have to wait a bit before raping her vaginally. She also recalled that both girls spoke of Appellant forcing his penis in their mouths for them to suck. (Id. at pgs. 67-71)

A.R. stated that she and her husband decided to take the children to St. Christopher's Hospital for Children a day later to have the girls examined due to their reported penetration. They waited a day until the chaos in their home somewhat subsided. At St. Christopher's Hospital for Children the parents and their children reported the abuse to medical personnel and to the police officer who had appeared in the Emergency Room.

During her testimony, A.R. recalled that K.G. had also confided with her female school teacher about what had happened around the same time the disclosures were made to her. (N.T. 04/02/2018 pgs. 74-75) When asked as if she had remembered any preceding incident involving

interception of Appellant's text message offering money to K.G., A.R. confirmed seeing that message and asking her son to translate for her since it was in English. She recalled that she had asked K.G. whether her uncle had been offering her money. (Id. at p. 73)

The topic of gift giving and phone purchase with messages relayed was initially explored by the defense during cross-examination. A.R. confirmed on cross that Carlos had purchased and given a phone for K.G. after K.G. had taken K.G.'s original phone given by her parents off of her due to failing grades and concerns stated by her teacher. During cross-examination, A.R. also corroborated the report that both girls had stayed in the hotel room in the Pocono Mountains with Appellant and his wife Milly while the entire family enjoyed a celebrated reunion. A.R. vehemently debated defense's assertion that Appellant had ceased seeing the girls on his own following a prior disagreement between Milly an A.R.

According to A.R. during some time well before the report of abuse, A. R. and Milly had ceased speaking because it was discovered that Milly had posted Facebook video of both of the girls dancing in adult clothing from Appellant's middle bedroom. She related that Carlos would continue thereafter to ask her husband to have the girls on his own for trips to the store etc. unbeknownst to his wife. Upon inquiry as to the lack of retention of the retention of text messages, A.R. stated that her husband had given to the police investigator a text message, last sent by Appellant, seeking to have the girls accompany him to the store shortly before the disclosure. (N.T. 04/02/2018 pgs. 84-86) At the end of her testimony A.R. confirmed that her children K.G. and J.G. had been staying with Milly and Carlos since they were about five to seven years old.

The victims' father "I.G." initially testified that he had moved with his wife son and two daughters sometime from Puerto Rico to Philadelphia in June of 2011. He recalled having a positive relationship with Appellant known to him as Carlos who had much earlier married his

-12-

sister Maria better known as "Milly." He acknowledged that Milly and Carlos lived at 4615 Shelbourne Street in Philadelphia and that they had helped his family transition to the area and obtain employment. Appellant became was I.G.'s foreman at the refinery where he worked.

The victims' father provided the history of the family's initial meeting, the method by which initial positive relationships had been formed, the resulting trust that Appellant and dad's sister Milly had fostered, and the gradual insertion of Appellant into their family life. I.G. recounted the increasingly frequent stay overs of his children at Appellant's home. He explained:

> "(m)e and my wife thinking, they don't got kids and the way—they behaving nice people, you know, she's a great aunt. And my daughter, when we took her first, she really showed love with my daughter, and stuff like that. So me thinking they don't have kids, you know, it's something normal, family wise to let them stay over and stuff like that, like normal parents should do in any family."

(N.T. 04/03/2018 pgs. 7-9)

He recollected that his daughter K.G. was about nine or ten years old and that his daughter J.G. was six or seven years old when they started spending overnights and weekends with Appellant and his sister Milly. He acknowledged that Milly and Carlos had showered his children with attention, gifts, and had taken them frequently to dinner and to the movies. (N.T. 04/03/2018 pgs.10-11) He recalled that at least a year before the abuse had been reported, he had noticed negative drastic changes with the behavior of his elder daughter K.G. He stated he had become concerned because K.G. had become reclusive and unusually avoided natural displays of affection from him. I.G. also remembered that J.G. also had acted strangely and that she had unsuccessfully tried to talk to him about four months before the final report of abuse. He stated that he had mistakenly thought she was going to tell him something silly and rebuffed her attempt to speak by telling her to forget it. (Id. at pgs. 11-12.) I.G. choked up as he spoke these words with palpable regret.

-13-

I.G. graphically related to the jury that everything "blew up" when his wife came home after picking up his children from school in May 2016. His wife and daughters were hysterical. As they tried to tell him what had been happening, he felt weak and begged them to stop because he could not bear to hear any details of what they were saying. He testified that when the children reported the abuse, his initial instinct was to find and kill Appellant but that he had refrained because of his strong religious faith. He said that he had stopped to think of his family's future without him if he had killed Appellant and went to prison. (Id. at p.16)

The victims' father confirmed that on May 18, 2016, the day after his daughters had revealed snippets of what had been occurring, both he and his wife had taken both children to St. Christopher's Hospital for Children to be physically examined. (Id. at pgs. 15-16, 72). I.G. acknowledged that about four to six months earlier, Milly and his wife had a falling out over Instagram photos depicting his daughters dancing in Appellant's middle bedroom in short shorts, a type of attire which had been prohibited in his house. After that dispute, his sister Milly stopped speaking to him and his wife. I.G. stated that Carlos however would individually text him to ask permission to take the girls shopping or to Burger King or pick them up from school on his own. At trial, the victims' father also became overwhelmed and struggled as he tearfully testified. He noted that after the report and arrest of Appellant, his mother ostracized his family. (Id. at p. 30)

Within the trial, defense counsel inquired of each witness about earlier text messages that been reportedly sent by Appellant to K.G. during the preceding years. Those defense questions also concentrated upon the report that Appellant or his wife had given K.G. a cellular phone and that at one point a phone had been taken off of K.G. by her parents when text messages reflecting Appellant's payments of money to K.G. The victims' mother had testified about asking K.G. about those observed messages and asking her daughter why Carlos had been providing her with money.

Those referenced messages had been possibly observed months before the report of abuse had been made. The apparent point of the defense inquiry was to challenge their existence because no phone messages had been preserved.

During this portion of cross-examination of the victims' dad, I.G., defense counsel debated with I.G. about Appellant' continued unsupervised access to his daughters after the earlier dispute with Milly. I.G. steadfastly maintained, similarly to his wife and children, that Appellant had continued unsupervised and independent contact with K.G. and J. G. up until about a week or two before the reporting of abuse, particularly when Milly was on vacation without Appellant in Florida and Puerto Rico. (N.T. 04/03/2018 pgs. 25-32)

In response to further defense inquiry, I.G. reiterated that shortly before the abuse had been reported to law enforcement, Appellant had sent him a text message to his phone asking to take both girls to Walmart to buy them stuff and bring them back to the house. (Id. at p. 32) I.G. testified that had not initially thought anything of it because Appellant had often made such requests in the past. Defense counsel inquired further, and in so doing seemed to challenge the existence of any messages because I.G. had not retained any of the old text messages and K.G.'s cellular phones. (Id. at pgs. 32-34)

During defense questioning, I.G. however communicated his memory that he had sent the screen shots of the last message from Appellant, seeking to take his girls to the store, and his response extracted from his cellular telephone, to the police investigator close in time to the forensic interviews conducted at Children's Alliance. I.G. also freely volunteered to search for the old phone that his sister Milly had given to K. G. and that Appellant had used to communicate with K.G. I.G. recollected that he had previously taken one of the two phones then possessed by

-15-

K.G. when her grades were failing before the reported abuse. He surmised that those two phones at issue may still be stored in a drawer at home. (Id. at pgs. 21-28)

The morning following an overnight break following I.G.'s testimony, the assigned prosecuting attorney placed on the trial record that after the previous day's inquiry, she had requested the assigned investigator to search the original file for any text messages. That investigator was only able to locate the screen shots that father had testified to providing to police shortly after the abuses had been reported exactly as he had testified. Those located screen shots were marked and introduced into the record as Commonwealth Exhibit #18. They were reflective only of a brief message of Appellant in Spanish wherein he had asked to K.G.'s father to take K.G. to Sears and father's brief response.

Notably, that exhibit simply corroborated the credibility of the parents' testimony that the message had been forwarded to police and the timing of the Appellant's request to see the children approximately a week or two timing before the report of abuse. The message was consistent with the recollection of the precipitating event that caused K.G. to break down and reveal Appellant's abuse had been sexually harming her and her sister.

The prosecuting attorney and defense counsel confirmed that the screen shots had been provided to defense counsel that morning. It had also been admitted by all parties and counsel that Appellant's cellular telephone from which these messages had originated had never been confiscated by law enforcement. (N.T. 04/04/2018 pgs. 40-46) Thus, that cellular telephone and any related records had remained entirely within the control of Appellant.

Defense counsel objected to its admission by the prosecution due to the late notice and claimed a *Brady* violation. Additional time as an initial remedy was accorded by this Court. The assigned investigator, Detective Patricia Eberhart of the Special Victim's Unit of the Philadelphia

-16-

Police Department, was questioned by this Court outside of the presence of the jury regarding her memory of their receipt and as to why the screen shot was not provided earlier. That investigator stated that she had erroneously not uploaded that message as part of discovery package in advance. The prosecutor also acknowledged that she must have missed seeing it during a subsequent review of the investigator's file. (N.T. 04/03/2018 pgs. 16-28) No prosecutorial misconduct had been remotely detected. Rather, this Court determined that it had been an oversight. Both counsel confirmed that Appellant's phone from whence the message had been sent had always been retained by Appellant. I.G.'s phone from whence the reply message had been sent had always remained in the possession of I.G.

Subsequently, the attorneys for both sides agreed that the prosecutor would refrain from admitting this evidence in its case in chief. This Court advised both attorneys however that the door to its admission could be revisited. (N.T. 04/03/2018, pgs. 24-30) Thereafter, defense counsel opened up the door to this exhibit's admission by attempting to unfairly provide a false impression of events via cross-examination of the assigned investigator Detective Patricia Eberhart to the jury. (Id. at pgs. 52-65) Thus, Detective Eberhart was permitted to be recalled to simply identify the exhibit depicting the screen shot text messages as the screen shot that had been forwarded to investigators by the victims' father close in time to abuse disclosure. (Id. at pgs. 67-70)

The victims' dad, I.G., was later recalled as rebuttal to identify and translate the messages on the exhibit as rebuttal form of evidence to correct the defense's blatant attempt to misdirect the jury and to refute the testimony provided by defense witness Aunt Milly. The defense was provided with ample opportunity to fully cross-examine father and the investigator as to all related topics. (Id. at pgs. 41-157) Contrary to later post-verdict and appellate claims, no request for mistrial had ever been raised by the defense.

Philadelphia patrol officer Mark Kusowski, Badge #5442, testified at trial that in response to a radio call regarding alleged sexual assault he had responded in uniform to St. Christopher's Hospital emergency room and met with both child victims and their parents and obtained a summary report from K.G. and J.G. (N.T. 3/28/18 pgs. 8-15). He recalled that both of the children were very quiet and shy but were able to provide some specifics. He was able to confirm from the children individually that each had reported being "vaginally raped by their Uncle Carlos. (Id. at pgs. 15-16).

Officer Kusowski stated that he had not pressed either child for any details because he had correctly surmised that the children would be naturally less inclined to speak to him as a male in uniform and that they would be more expertly interviewed later. He had prepared a brief report reflecting his contact and collected identification data regarding the identity of Appellant. Officer Kusowski testified that, given the passage of time, he could not recall exact details of his encounter aside from the sharp memory that everyone in this family was extremely emotional and that vaginal rape of both children by their Uncle Carlos had been reported. (Id. at pgs.15-16)

Medical data was introduced via stipulation reflective of the respective examinations conducted of each victim recorded by personnel at St. Christopher's Hospital For Children and by the associated Child Protection Program assigned Nurse Practitioner Elizabeth Grund of J.G. and by Nurse Grund's supervisor Dr. Maria McColgan of K.G. The records of each evaluation contained salient disclosure details that the children had provided to the medical personnel particularly concerning the various methods by which Appellant had repeatedly sexually abused them. Each child underwent an intensive physical examination and provided separate interviews.

Following the stipulated admission of medical records pertaining to each victim; Dr. Maria McColgan testified and initially provided to the jury a capsule summary of her vast experience in

the field of child abuse pediatrics particularly following her years of ongoing training and practical experience having worked many years at St. Christopher's Hospital for Children in various positions. (N.T. 04/02/2018 pgs. 90-91) Per stipulation by and between both parties through counsel, Dr. Maria McColgan testified as an expert in the field of pediatrics medicine and specifically child abuse both sexual and physical pediatrics who at the time she testified had been working as a pediatrician specializing in child abuse at the Child Institute. (Id. at pgs. 91-92) Dr. McColgan provided thorough analysis of the data contained within the medical reports which included the physical examination of both child victims and interviews conducted. Each set of records included an outline of the graphic details that had been separately recounted by each child and the noted observations of resulting emotional impact upon each child. (Id. at pgs. 92-106)

Dr. McColgan diagnosed that they were both K.G. and J.G. had been victims of sexual abuse. "And in K.G.'s case, she was also–had suicidal ideation." (Id. at p.106) Dr. McColgan expertly opined that the reflection of "normal physical examinations" didn't detract from their respective reports of sexual abuse with penetration. She correctly explained that particularly given the natural elasticity of the body parts involved and the length of time following the children's disclosure, the normal findings were not unusual. She stated that "More than 95 percent of kids who are sexually abused even when they disclose penetration have normal examinations, even in cases where there was videotapes or enough evidence leading to criminal prosecution." (Id. at pgs. 106-113)

After providing clear and cogent reasons for her opinions and diagnoses, Dr. McColgan summarized, "So in this case, both children give very clear histories of sexual abuse, including giving contextual details about what happened, as well as how they felt about what happened and

had significant psychological sequel as a result of sexual abuse. So in this case, my diagnosis for both children is sexual abuse." (Id. at pgs. 112-113)

In addition to the intrusive physical examinations conducted, each child victim was also subsequently forensically interviewed separately by a Philadelphia Children Alliance bilingual forensic examiner or specialist. As agreed, both of the recorded forensic interviews had been video-taped and introduced into evidence and displayed in full to the fact-finding jury at trial within the testimony of bilingual Philadelphia Children's Alliance Forensic Specialist Carolina Castanio who had been one of the persons employed to conduct the recorded interviews. (N.T. 04/03/2018, pages 41-103)

Specialist Carolina Castanio testified that each child victim had been separately interviewed, in separate rooms in a child friendly environment at the Philadelphia Children's Alliance ("PCA") location in Philadelphia shortly after their reports of the attacks had been made to medical personnel at St. Christopher's Hospital. After providing a summary of her extensive training and her ability as a Columbian native speaker of Spanish, she explained her familiarity with frequent and natural manner in which children of the victims' ages often gradually recount their experiences in bits and pieces. (Id. at pgs. 45, 71-72)

PCA Specialist Carolina Castanio testified that during each forensic interview each child was permitted to simply provide the memories that each had wished to discuss without any pressure. She stated that the questions posed as part of the investigative process were "unbiased, not leading and nonsuggestive." (Id. at pgs. 45-49) She educated the jury as to how time perception differs with children than adults. Ms. Castanio reported her recorded impressions of K.G. and J.G. before during and after each recorded interview was played in succession. (Id. at pgs. 49-70) Those recorded impressions demonstrated the consistency, sensory details of the abuse disclosures

-20-

provided by each child as well as their physical reactions that had been emoted evidencing their inner turmoil. She also provided translation for the Spanish words that each child had used at times. (Id. at pgs. 53-104)

The separately recorded interviews admitted in full as evidence demonstrated that each child victim had in detail described the predatory methods of sexual abuse that each had suffered. Within each interview each child recounted multiple traumatizing memories of Appellant's sexual assaults beginning with forcible touching of hands and use of his backscratcher onto their private parts. Each provided information that reflected Appellant's progressive sexual assaults of various forms including Appellant's penile penetration of their vaginas, mouths and as to K.G. her anus. Both spoke of being forced to perform oral sex with their mouths upon Appellant's penis. They recalled the bad smelling white milky like substance that would appear from his penis. All accounts credibly reflected repeated attacks had taken place over multiple years and their fear of harm from Appellant from reporting.

Detective Patricia Eberhart testified that based upon all investigative efforts conducted which included compilation of all witness interviews, medical reports, and positive identification, age confirmation and residence location of the perpetrator, she secured an arrest warrant for Appellant Carlos Arroyo. Appellant had been arrested pursuant to execution of that warrant on June 1, 2016. After the preliminary hearing, arraignment, and scheduling conferences, the jury trial commenced on March 27, 2018, with this Court as the presiding trial jurist. In summary, the prosecution presented compelling evidence in the form of medical records, interview reports, video-taped recordings of interviews and live testimony presented from the responding police officer, the assigned investigator, both child victims and their parents, the forensic interview specialist, and the stipulated child abuse pediatric expert.

-21-

Upon completion of the prosecution's case in chief, the defense presented fact and character testimony. The mother of "Aunt Milly" and paternal grandmother testified that Appellant possessed good character and had been so helpful to her in the past. She asserted her biased opinion that her granddaughters must have been lying. An adult niece of Appellant also testified as to Appellant's good character peppered with a similarly stated bias in favor of Appellant.

Appellant's wife Maria Guzman Arroyo otherwise known as "Aunt Milly" waived her Fifth Amendment rights against self-incrimination after she had been afforded consultation of an appointed attorney by this Court. Aunt Milly incredulously testified that her husband had never been even left alone with the two victims during the preceding years. She essentially testified that she had been by her husband's physical side at all hours of the day and night particularly when the two victims were at her home. (N.T. 04/04/2018 p.107) She even argued that when the victims had stayed at her home she always showered with her husband. (Id. at p. 110)

Additionally, Aunt Milly claimed that she had always waited until Appellant had gone to bed before retiring to sleep every time her nieces had been in her home. Aunt Milly actually said, "I never go to sleep and leave them up. I'm always with them up." (Id. at p. 108) She also vehemently asserted that her intense monitoring of her husband's activities continued even during his work hours and even when she was in Puerto Rico. She also claimed to have constantly checked his cellular telephone and detected no pornographic materials.

Milly specifically denied ever supplying liquor in any form to either child. She claimed to have zero knowledge of anything untoward ever happening. She boldly proclaimed that the children must have been lying. She attempted to attach improper motivation to her brother's family because she had a prior rift with the victim's parents some months earlier before the abuse. According to her, all of her and her husband's contact with both children had ceased due to the

-22-

argument concerning a YouTube display of the two child victims dancing in very short shorts in the spare bedroom of Appellant's home. (Id. at pgs. 124-125)

Milly agreed that both victims had a positive relationship with her and her husband and that they had stayed overnight at their Shelbourne Street residence. She confirmed the fact that her two nieces had stayed with her and her husband in the Pocono Mountain hotel but reiterated that her nieces had never been left alone with Carlos and that she and Carlos showered together. (N.T. 04/04/2018 p.112-114) Milly also admitted that she and her husband had made a few purchases of toys for both children including the phone that had been given to K.G. She firmly however disavowed any purchase of any clothing and having anything to do with the filming of the video from the middle bedroom of her home. (Id. at pgs.123-124). Milly confirmed the presence and use of Vaseline and backscratchers in her home because Carlos had skin rashes from psoriasis. (Id. at pgs. 120-123)

Following his wife's testimony, Appellant chose not to testify and the defense rested. After the close of the defense's case, the prosecution recalled as rebuttal, the victims' father I.G. to identify and translate from Spanish to English the brief screen shot messages marked as Commonwealth Exhibit #18. He confirmed that exhibit as the copy of the screen shot of the messages that he had forwarded to the initial investigator shortly after the disclosure of abuse.

On April 5, 2018, after a week-long trial, the jury briefly deliberated and returned guilty verdicts to all charges for both cases. As to CP-51-CR-0009217-2016 relating to victim K.G., Appellant was found guilty of: Count 1: Rape of a Child, under 18 § 3121 §§ C, graded as a Felony of the First Degree; Count 2: Involuntary Deviate Sexual Intercourse with a Person Less Than 16 Years Age, under 18 § 3123 §§ A7, graded as a Felony of the First Degree; Count 4: Aggravated Indecent Assault of a Child, under 18 § 3125 §§ B, graded as a Felony of the First Degree; Count

-23-

6: Endangering Welfare of Children, under 18 § 4304 §§ A1, graded as a Felony of the Third Degree; and Count 7: Corruption of Minors, under 18 § 6301 §§ A1, graded as a Felony of the Third Degree.

As to CP-51-CR-0009218-2016 relating to victim J.G., Appellant was found guilty of: Count 1: Rape of a Child, under 18 § 3121 §§ C, graded as a Felony of the First Degree; Count 2: Involuntary Deviate Sexual Intercourse With A Child, under 18 § 3123 §§ C, graded as a Felony of the First Degree; Count 5: Endangering Welfare of Children, under 18 § 4304 §§ A1, graded as a Felony of the Third Degree; Count 6: Corruption of Minors, under 18 § 6301 §§ A1, graded as a Felony of the Third Degree; and Count 12: Aggravated Indecent Assault of a Child, under 18 § 3125 §§ B, graded as a Felony of the First Degree.

Following the recording of jury verdicts, this Court directed the completion of Presentence Evaluations and Mental Health Evaluations by the First Judicial District Probation and Parole Department and scheduled the sentencing hearing in due course for September 14, 2018. This Court also directed that a Sexual Violent Predator Assessment be completed. Prior to the scheduled sentencing hearing Appellant hired new counsel Michael J. Diamondstein, Esquire. Although the Sexual Violent Predator Assessment had reportedly been completed, the District Attorney's Office of Philadelphia as the representative of the Commonwealth of Pennsylvania did not pursue the Sexual Violent Predator Assessment or its corresponding designation. This Court had not been provided with a copy of that assessment. Rather it was agreed that Appellant was a Tier III Sexual Offender with lifetime registration requirements as stated within the "SORNA" [1]statute.

---

[1] "SORNA" = Sexual Offender Registration and Notification Act, 42 Pa.C.S. §§ 9799.10-9799.75, Acts 10 & 29, effective February 21, 2018 and re-enacted June 12, 2018. In the instant matter, Sections: Subchapter H. 42 PA.C.S. §§ 9799.42 applied because the offenses had been committed after December 20, 2012; Thus, Sexual Violent Predator Designation and Tier III-Lifetime Registration with possible petition for removal from registry after 25 years could have been employed.

After review of all completed presentence reports and consideration of all relevant sentencing data, victim impact testimony, and character testimony submitted at a full and fair sentencing hearing, the following Orders of Sentence were imposed:

As to the case docketed under CP-51-CR-0009217-2016 related to the victim K.G.:

Count 1: Rape of a Child- Minimum ten (10) years to maximum twenty (20) years of state supervised term of confinement;

Count 2: Involuntary Deviate Sexual Intercourse with a Child with a Person Less Than 16 Years Age- Minimum ten (10) years to maximum twenty (20) years of state supervised term of confinement;

Count 4: Aggravated Indecent Assault of a Child- Minimum ten (10) years to maximum twenty (20) years of state supervised term of confinement;

Count 6: Endangering Welfare of Children- Minimum three and a half (3.5) years to maximum seven (7) years of state supervised term of confinement;

Count 7: Corruption of Minors- Minimum three and a half (3.5) years to maximum seven (7) years of state supervised term of confinement.

As to the case docketed under CP-51-CR-0009218-2016 related to victim J.G.:

Count 1: Rape of a Child- Minimum ten (10) years to maximum twenty (20) years of state supervised term of confinement;

Count 2: Involuntary Deviate Sexual Intercourse with a Child- Minimum ten (10) years to maximum twenty (20) years of state supervised term of confinement;

Count 5: Endangering the Welfare of Children- Minimum three and a half (3.5) years to maximum seven (7) years of state supervised term of confinement;

Count 6: Corruption of Minors- Minimum three and a half (3.5) years to maximum seven (7) years of state supervised term of confinement;

Count 12: Aggravated Indecent Assault of a Child- Minimum ten (10) years to maximum twenty (20) years of state supervised term of confinement.

Each case reflecting imposition of sentences for five separately convicted felony graded offenses related to each child victim resulting in imposition of an aggregate sentence of thirty-seven (37) years to a maximum period of seventy-four (74) years of state supervised confinement.

-25-

The respective sentences imposed in each case related to each separate victim were imposed consecutively. Credit was given for custodial time served. Rehabilitative conditions were imposed.

Appellant was ordered to mandatorily register over the remainder of his life-time as a sex offender with the state police and to comply with all Tier III Megan's Law of SORNA requirements, including DNA, fingerprinting, palm printing, and photo submission requirements. Appellant was also directed to have no unsupervised contact with minors under any circumstances and have absolutely no contact with either of the victims or members of their immediate family. Additionally, Appellant was ordered to avail himself of vocational training, educational training, and sex offender treatment.

Following imposition of the respective Orders of Sentence, Post-Sentence Motions were filed on Appellant's behalf on September 21, 2018. The claims recited within the Post-Sentence Motions essentially mirrored the subsequently recited appellate claims of error. The Post-Sentence Motions were denied per operation of law on January 16, 2019. A Notice of Appeal was filed on behalf of Appellant by then newly hired appellate counsel Jack McMahon, Esquire relative to both cases on February 7, 2019. Pursuant to preceding Order of Court, on July 31, 2019, a *Statement of Matters Complained of on Appeal Pursuant to Pennsylvania Rule of Appellate Procedure 1925(b)* was filed on behalf of Appellant, wherein the following matters verbatim claims were raised:

1. The evidence at trial was insufficient to sustain the Commonwealth's burden with respect to all the charges.

2. The verdict was against the weight of the evidence as Mr. Arroyo was of good character. Mr. Arroyo produced credible testimony that he did not commit the instant offenses.

3. Mr. Arroyo submits that a new trial should be ordered as the Court erroneously denied a Motion for Mistrial.

4. The Commonwealth's failure to provide Mr. Arroyo and his trial counsel with the text messages prior to trial (whether intentionally, mistakenly, or

-26-

negligently) denied Mr. Arroyo of both Federal and State procedural and substantive due process rights and the effective advice of counsel.

5. The sentence is cruel and unusual punishment.

6. The sentence is not rationally related to the guidelines, to any empirical notions of sentencing, to other similarly situated individuals, nor does the sentence comport with the purposes of sentencing.

7. The sentence is patently excessive.

8. The sentence is not only a life sentence for Mr. Arroyo but would be a life sentence for a newborn.

9. For all of the above reasons the sentence violates both the Federal and Commonwealth of Pennsylvania Constitutions.

DISCUSSION

The Statement of Matters Complained of on Appeal initially recited two related claims. First, Appellant alleged that the evidence had been insufficient to sustain the "Commonwealth's burden with respect to all charges" and alternatively, Appellant averred that the verdicts were against the weight of the evidence. Appellant also claimed that the trial court had erroneously denied a defense Motion for Mistrial. Contrary to this assertion, the transcribed record did not reflect that the defense had ever filed a Motion for Mistrial at any point during trial and no genesis for the nonexistent mistrial motion had been identified within the 1925(b) Statement.

Appellant argued separately that the "Commonwealth's failure to produce text messages" prior to trial denied Appellant of his due process rights. Finally, Appellant complained about the length of the imposed periods of confinement and legality of the respective Orders of Sentence. All claims regarding the imposition of the respective Orders of Sentence shall be discussed collectively.

Summarily, as set forth more fully below, all of Appellant's arguments fail because: ample evidence had supported each conviction; the late production of the minimally relevant two text

-27-

messages at issue was resolved reasonably during trial, did not prejudice Appellant and certainly did not warrant the extreme remedy of a new trial; and finally that this Court had entered respective Orders of Sentence addressing each offense for which Appellant had been duly convicted that were justified particularly given the extreme harm that Appellant had knowingly and systematically inflicted upon his two defenseless and very young nieces during an approximate five year period.

## I.     Sufficient evidence existed to support all convictions.

Appellant contended that all jury verdicts of guilt recorded for each offense in each of the two cases involving the separate victims had not been sufficiently supported with evidence. In reviewing the sufficiency of evidence, an appellate court considers "whether the evidence presented at trial was sufficient to establish all elements of the crime beyond a reasonable doubt." *Commonwealth v. Burton*, 2 A.3d 598 (Pa. Super. Ct. 2010). The appellate court views all the evidence and reasonable inferences therefrom in a light most favorable to the Commonwealth as verdict winner. *Id.* Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail. *Id.* The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." *Commonwealth v. Feliciano*, 2013 PA Super 117, 67 A.3d 19 *quoting Commonwealth v. Stokes*, 2011 PA Super 261, 38 A.3d 846, 853-854 (Pa. Super. 2011) (internal citations and quotations omitted).

In both cases related to individual victims K.G. and J.G., Appellant had been convicted of Rape of a Child pursuant to 18 Pa.C.S.A. § 3121(c) graded as a first-degree felony. The statutory elements are straightforward. A person is guilty of the crime of Rape of a Child if the evidence proves beyond a reasonable doubt that the adult person engaged in sexual intercourse with a minor

-28-

person of the same or opposite sex who was less than thirteen (13) years old. 18 Pa.C.S.A. § 3121(c).

The term "sexual intercourse" includes not only vaginal sex, but also "intercourse per os or per anus, with some penetration however slight; additionally, "emission is not required."18 Pa. Cons. Stat. Ann. § 3101. The term "sexual intercourse" also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." 18 Pa.C.S.A. § 3101; see also *Commonwealth v. Kelley*, 569 Pa. 179, 801 A.2d 551, 555 (Pa. 2002), citing *Commonwealth v. Lee*, 432 Pa. Super. 414, 638 A.2d 1006 (Pa. Super. 1994), appeal denied, 538 Pa. 643, 647 A.2d 898 (Pa. 1994) (interpreting sexual intercourse and deviate sexual intercourse to include acts of oral and anal sex).

Both K.G. and J. G. reported having been penetrated vaginally with Appellant's penis, hand, mouth and backscratcher beginning when they were under the ages of seven and nine years of age and repeatedly occurring well during the period of time each was under the age of thirteen years. K.G. testified that Appellant, Uncle Carlos, admittedly an adult, began with inappropriate touching but then quickly escalated to penetrating her vagina with his penis when she was less than nine years of age. She recounted to the jury that Appellant repeatedly penetrated her vagina with his penis, put his tongue on her vagina, and forced open her mouth while he inserted his penis. (N.T. 3/28/2018, pp. 29-36). She testified that he often licked her "pussy" and that she would resist by pushing away and pleading for him to stop, but that he would continue the abuse relentlessly. (Id. at 41). K.G. acknowledged becoming aware of similar acts being perpetrated upon her younger sister J.G. She tried to prevent harm to her sister by enduring more attacks.

Furthermore, K.G.'s younger sister J.G. testified that beginning when she was less than eight years old, Appellant had displayed his penis, routinely licked her vagina and inserted his penis into her vagina. She stated that frequently he would force his penis in her mouth when she was younger than eight years of age and that his actions also quickly escalated. (N.T. 3/29/18 p. 29). Like K.G., J.G. would resist, but Appellant had been aggressive and forceful. J. G. also confirmed observing the repeated sexual attacks upon her older sister. Each child recounted being threatened with harm of either told anyone what had occurred.

Each child's independent interviews that had been conducted by the Child Alliance Forensic Interviewer were introduced in the record by agreement and viewed in their entirety by the jury. Within each interview both children credibly and consistently recounted additional graphic details of Appellant's varied methods of offense element qualifying sexual attacks. The evidence supporting proof of both counts of this offense was overwhelming.

Appellant averred that there was insufficient evidence to convict him of both first-degree felony graded separately defined offenses of Involuntary Deviate Sexual Intercourse as it related to each victim. As to the crime affecting victim K.G., this Court provided the standard instruction which mirrored the statutory elements cited under 18 Pa.C.S.A. § 3123(a) (7) - Involuntary Sexual Intercourse. For that separate offense, conviction of Appellant required the prosecution to have proven beyond a reasonable doubt that Appellant had engaged in sexual intercourse with K.G. when K.G. was less than sixteen (16) years of age and when the Appellant was four (4) more years older than K.G. and that K.G. and Appellant had not been married to each other when the sexual intercourse had occurred. (See N.T. 04/05/2018 pages 78-83).

As to the first-degree felony graded offense of Involuntary Deviate Sexual Intercourse with J.G. as the identified younger victim, this Court accurately recited to the jury the statutory

-30-

elements under 18 Pa.C.S.A. § 3123(b) - Involuntary Deviate Sexual Intercourse with a Child as follows:

> (b) Involuntary deviate sexual intercourse with a child. —A person commits involuntary deviate sexual intercourse with a child, a felony of the first degree, when the person engages in deviate sexual intercourse with a complainant who is less than 13 years of age.

As this Court further explained, penetration as defined in both versions of the offense was required to be proven, "however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." 18 Pa.C.S.A. § 3101; see also *Commonwealth v. Kelley*, 569 Pa. 179, 801 A.2d 551, 555 (Pa. 2002), citing *Commonwealth v. Lee*, 432 Pa. Super. 414, 638 A.2d 1006 (Pa. Super. 1994), appeal denied, 538 Pa. 643, 647 A.2d 898 (Pa. 1994) (interpreting sexual intercourse and deviate sexual intercourse to include acts of oral and anal sex). (See N.T. 04/05/2018 pgs. 78-83).

As the cumulative evidence introduced at trial unequivocally proved Appellant as an adult not only forcibly inserted his penis into their respective vaginas, licked their vaginas, and as to K.G. painfully inserted his penis into her anus, but he had also routinely forced each child to perform acts of oral sex on his penis until "white stuff appeared that "smelled disgusting" or looked like "milk."

Appellant also complained that there was insufficient evidence to convict him of the first-degree felony offenses of Aggravated Indecent Assault of a Child pursuant to 18 Pa.C.S.A. §3125 §§ B, graded as a Felony of the First Degree as it related to both victims. As to this charge this Court explained all statutory elements to the jury consistently with the applicable statute. Aggravated Indecent Assault and Aggravated Indecent Assault of a Child is defined within 18 Pa.C.S.A. §3125 (a) and (b) as follows:

-31-

**3125. Aggravated indecent assault.**

**(a) Offenses defined.**--Except as provided in sections 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse) and 3124.1 (relating to sexual assault), a person who engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault if:

(1) the person does so without the complainant's consent;

(2) the person does so by forcible compulsion;

(3) the person does so by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(4) the complainant is unconscious or the person knows that the complainant is unaware that the penetration is occurring;

(5) the person has substantially impaired the complainant's power to appraise or control his or her conduct by administering or employing, without the knowledge of the complainant, drugs, intoxicants or other means for the purpose of preventing resistance;

(6) the complainant suffers from a mental disability which renders him or her incapable of consent;

(7) the complainant is less than 13 years of age; or

(8) the complainant is less than 16 years of age and the person is four or more years older than the complainant and the complainant and the person are not married to each other.

**(b) Aggravated indecent assault of a child.** -- A person commits aggravated indecent assault of a child when the person violates subsection (a)(1), (2), (3), (4), (5) or (6) and the complainant is less than 13 years of age.

18 Pa.C.S.A. §3125.

Each child reported Appellant, as an adult, repeatedly forced them to suffer penile and mouth penetration of their genitals or anus beginning when each child was well under thirteen years of age. K.G. reported continued forced mouth and penis penetration of her vagina beginning the age of eight and nine years old. She also reported that early on in the abuse process Appellant had forced his penis into her anus causing extreme pain. She recalled feeling utterly confused at the age of nine years old because she was unable to stop Appellant from hurting her. She testified that she was made all the more fearful because Appellant had threatened her if she had disclosed the abuse. He convinced this child that no one would believe her. Her Aunt made her dizzy by plying her with alcohol to make her easier prey.

-32-

K.G.'s younger sister J.G. testified that Appellant's progressive attacks began when she was less than seven years of age. She also stated that Appellant had repeatedly forced his penis into her mouth and then later inside her vagina. She conveyed her feeling of being unable to stop Appellant and to being threatened by him. She reported that she had observed similar acts performed upon her sister. All statutory elements were correctly conveyed to the jury within the final instructions. The cumulative evidence overwhelmingly supported the convictions for these offenses.

Appellant alleged that the evidence was insufficient to find him guilty of the third-degree felony graded offense of Endangering Welfare of Children-Parent/Guardian/Other Commits Offense pursuant to 18 Pa.C.S.A. § 4304 §§ A1 separately related to each victim. This offense is statutorily defined: "[a] parent, guardian, or other person supervising the welfare of a child under 18 years of age.... commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304.

As this Court consistently informed the jury, conviction of Appellant for this offense required proof beyond a reasonable doubt that: 1) the accused was aware of his or her duty to protect the child; 2) the accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare; and 3) the accused had either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare. See also *Commonwealth v. Pahel*, 456 Pa. Super. 159, 689 A.2d 963, 964 (Pa. Super. 1997), citing *Commonwealth v. Cardwell*, 357 Pa. Super. 38, 515 A.2d 311, 315 (Pa. Super. 1986).

The Commonwealth of Pennsylvania proved to the jury's fact-finding satisfaction that Appellant had abused his adult guardianship authority as supervising uncle of his minor nieces to

-33-

facilitate his continuing criminal course of conduct that harmed each of them physically and mentally. Thus, Appellant had repeatedly violated his statutory attributed duty of care toward these two children.

Finally, Appellant asserted claims that there was insufficient evidence to convict him of Corruption of Minor pursuant to 18 Pa.C.S.A. § 6301(a)(1)(ii) as it related to both victims. The statute recites that an individual commits the crime of corruption of minors when:

> "whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court, commits a misdemeanor of the first degree."

18 Pa.C.S.A. § 6301(a)(1)(i).


Subsection (ii) of 18 Pa.C.S.A. § 6301(a)(1) further provides:

> "whoever, being of the age of 18 years and upwards, by any course of conduct in violation of Chapter 31 (relating to sexual offenses) corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of an offense under Chapter 31 commits a felony of the third degree."


Additionally, the Pennsylvania Supreme Court has explained:

> "The Commonwealth need not prove that the minor's morals were actually corrupted. Rather, a conviction for corrupting morals will be upheld where the conduct of the defendant tends to corrupt the minor's morals. The statute speaks to conduct toward a child in an unlimited variety of ways which tends to produce or to encourage or to continue conduct of the child which would amount to delinquent conduct." *Commonwealth v. Mumma*, 489 Pa. 547, 414 A.2d 1026, 1030 (Pa. 1980) (citations and quotation marks omitted) (emphasis added).

The statute requires that the knowing, intentional acts of the perpetrator tend to have the effect of corrupting the morals of a minor. Actions which tend to corrupt the morals of a minor are those that "would offend the common sense of the community and the sense of decency, propriety and

morality which most people entertain." *Commonwealth v. Decker*, 698 A.2d 99, 101 (Pa. Super. 1997) [appeal denied, 550 Pa. 698, 705 A.2d 1304 (Pa. 1998)].

In the instant matter, the cumulative evidence presented overwhelmingly proved that Appellant's continuing course of corrupting conduct affecting both child victims extended over a multiple year period. At the very least, his constant exposure of these children to pornographic materials alone satisfied the elements of this offense. Similarly, the testimony presented by various witnesses provided proof that Appellant had showered the victims with gifts and plied them with money to keep his deviant and criminal behavior hidden. These acts also provided corroborating proof of his continuing corrupting conduct. Finally, the myriad forms of systematic sexual attacks did indeed robbed each child of their innocence.

To summarize, the collective direct and circumstantial evidence introduced in these cases strongly supported that Appellant had committed multiple incidents of Rape, Involuntary Sexual Assault, Aggravated Indecent Assault of a Child, and Unlawful Contact with a Minor and by so doing intentionally and methodically endangered each victim's physical and mental welfare while corrupting each child's morals as part of a continuing course of exploitive conduct.

These crimes predominantly began and repeatedly occurred while the complainants were between the ages of eight (8) and twelve (12) years old. Notably, K.G. testified that Appellant had repeatedly hurt her when he penetrated her vagina and anus with his penis when she was under nine (9) years old. From very early on, Appellant had also routinely inserted his tongue and hands and backscratcher on her breasts and in her vagina. He forced K.G. to open her mouth while he inserted his penis on too numerous occasions to count. K.G. had testified that she would resist by pushing away and pleading him to stop, but that he would relentlessly continue the abuse.

-35-

Likewise, K.G.'s younger sister J.G. had testified that Appellant had licked her vagina and revealed his penis to her on multiple occasions beginning under the age of eight years old. Beginning also at an early age and continuing non-stop until she was ten (10) years old, Appellant would habitually place it on her body and force it in her mouth. Similarly, J.G. would resist, but Appellant had been too aggressive and forceful.

Each child independently reported that Appellant had threatened them which left them each fearful and alone and unable to inform anyone of the abuse. Furthermore, Appellant had continually placed himself and his wife as guardians or familial caretakers of both children when he volunteered to child sit them for daytime visits and then progressive weekend overnights stays in his home, trips to stores in his truck, as well as during the hotel stay in the Pocono Mountains.

No viable motivation for these clearly traumatized children to have fabricated anything had been presented. Rather the collective evidence introduced at trial provided to the jury as fact finders overwhelming corroboration of each of their credible, graphic and consistent accounts. Accordingly, no trial court error had been committed by denying the post-sentence motions based upon sufficiency of evidence claims.

**II.    Appellant was not entitled to a new trial based on the weight of the evidence.**

Similar to the sufficiency of evidence claims, Appellant argued that the trial court had committed an abuse of discretion by denying his motion for a new trial on weight of the evidence grounds. Appellant attempted to buttress this claim by asserting that the evidence resulting from the introduction of defense fact witness, Appellant's wife, Maria Guzman Arroyo, also known as Milly, and the familial witnesses that had opined that Appellant's had possessed "good character" outweighed the cumulative evidence of Appellant's guilt. However, this claim was likewise without merit for the reasons as stated within this Court's analysis of the sufficiency of evidence

-36-

claims and supplemented by the rationale recited below. Essentially, the collective weight of the evidence abundantly supported all of the fact-finding jury verdicts of guilt.

The weight given to the evidence is wholly within the province of the finder of fact "who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Hunzer*, 868 A.2d 498, 506-507 (Pa. Super. 2005). Any motion for a new trial grounded in the contention that the "verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191-1192 (Pa. Super. 2004), appeal denied, 583 Pa. 689, 878 A.2d 864 (2005).

The decision whether to grant a new trial on this basis rests within the discretion of the trial court. *Commonwealth v. Hunter*, 381 Pa. Super. 606, 617, 554 A.2d 550, 555 (1989). "A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the . . . verdict is so contrary to the evidence as to shock one's sense of justice and [make] the award of a new trial [ ] imperative so that right may be given another opportunity to prevail." *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155-1156 (1986).

A weight-of-the-evidence claim "concedes that sufficient evidence exists to sustain the verdict but *questions which evidence is to be believed." Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa.Super.2006) (quoting *Commonwealth v. Galindes*, 786 A.2d 1004, 1013 (Pa.Super.2001)) (emphasis added); such a claim only challenges how much weight should be "accorded . . . testimonial evidence." *Commonwealth v. Morgan*, 2006 PA Super 351, 913 A.2d 906, 909 (Pa. Super. Ct. 2006) (quoting *Armbruster v. Horowitz*, 744 A.2d 285, 286 (Pa. Super. 1999)).

The cumulative evidence that had been presented in both cases by the Commonwealth of Pennsylvania was credible, convincing and compelling. Nothing presented in this trial remotely

-37-

suggested that the jury's guilty verdicts had been entered contrary to, nor is it against the weight of the evidence. The conclusions and verdict reached by the finders of fact were logically based on common sense inferences sufficient to eviscerate any possible conclusion that the convictions were based on surmise or conjecture. None of the verdicts shocked anyone sense of fairness or justice. To the contrary, each of the victim's testimony standing alone was trustworthy and unwavering. Moreover, the corroborating forms of evidence supplied to the jury confirmed all of the victims' respective accounts.

Contrasting the witnesses presented by the Commonwealth of Pennsylvania, the evidence presented by the defense, particularly from Appellant's wife, "Aunt Milly," actually strengthened the Commonwealth's case with its obvious incredibility. Appellant's wife unswervingly testified to an extremely unrealistic version of events. She vehemently argued that her husband never had any individual access to either of his nieces at any point in time over the span of five years. She even maintained that she had kept surveillance of all of his activities even when she had not been physically present. The jury as fact-finder reasonably dismissed her testimony as biased and absurd. Likewise, the clearly biased defense character testimony did not dispel the jury's assessment of credibility. Indeed, the defense character evidence corroborated the testimony of the victims and their parents that each had been lured to trust Appellant because of his positive projection of "good character." It corroborated the evidence that Appellant had exploited his status within the community to abuse these children.

Therefore, no trial court error had been committed because none of the jury's verdicts had been properly entered against the super strength of the evidence introduced at trial. Since no error had been committed, no remedy was warranted.

**III.    No denial of Motion for Mistrial had occurred.**

-38-

Within the Appellant's counselled post-sentence motions and Statement of Errors, Appellant claimed that "Mr. Arroyo submits that a new trial should be ordered as the Court erroneously denied a Motion for Mistrial." The salient difficulty with this claim is that no mistrial motion in any form had ever been raised at trial for any reason. Thus, there had been no erroneous denial of it by this Court.

**IV. No new trial was warranted because Appellant's due process and effective assistance of counsel rights had not been violated following reasonable resolution of late production and rebuttal admission of text message evidence.**

Appellant claimed within his 1925(b) Statement, that "the Commonwealth's failure to provide Mr. Arroyo and his trial counsel with the text messages prior to trial (whether intentionally, mistakenly, or negligently) denied Mr. Arroyo of both Federal and State procedural and substantive due process rights and the effective advice of counsel." Although as stated, this claim was vague and overbroad, its gleaned genesis related to defense counsel's objection to the prosecution's day late production and subsequent largely rebuttal admission during trial of Commonwealth Exhibit #18, which contained a single screen shot of a text message in Spanish and its reply. The initial text message had been apparently sent by Appellant from Appellant's cell phone, which he has always retained in his possession, to the child victim's father's cell phone which he had also retained in his possession sent approximately two weeks before the victims' disclosure of abuse to medical and legal authorities. The message in Spanish reflected Appellant's request to I.G. to take K.G. to Sears. It was coupled with the terse response from the victim's father that he would check and see if that request was agreeable.

Apparently about the time the children were being interviewed by law enforcement or by Children's Alliance, the victims' dad, I.G., had forwarded that screen shot copy of the two messages to the assigned investigator via his cell phone. Unfortunately, the assigned investigator,

-39-

Detective Eberhart had neglected to upload the copy of this message into the discovery package and the assigned prosecutors had apparently missed it during their physical review of the investigator's file.

Contextually, the tangential relevance of this screen shot, marked and introduced into evidence as Commonwealth's Exhibit #18, was created from the defense cross-examination of the child's father. Defense counsel asked the victim's father, I.G., various questions concerning multiple communications between the victim's father and Appellant and other communications particularly between K.G. and Appellant as well the timeline and the nature of contact between the children and Appellant (N.T. 4/4/18, p. 13). Father had recollected that the last time that Appellant had requested to see his two girls was about two weeks before their disclosure of abuse at St. Christopher's Hospital for Children. (N.T. 04/03/2018 pgs. 22-26)

When defense counsel challenged the existence of any verifying messages, I.G. responded that he believed he still had possession of those older phones. He testified that did not know if the messages from K.G.'s phone that Appellant had given K.G. were still available or if any messages were still on them if found. The only message that he had recalled retaining was a screen shot that he had forwarded to the investigator regarding the last known request of Appellant to him. (N.T. 04/03/2018, pgs. 22-26)

Between the overnight after I.G. testified and the next morning apparently the investigators' file was searched and the screen shot that I.G. had sent was located and turned over to the defense before the beginning of any further testimony that day. Defense counsel naturally raised an objection to any proposed admission by alluding to a potential unspecified *Brady* violation. (N.T. 04/04/2018, pgs. 11-16)

This Court explored the circumstances of the late production by conducting an examination of the assigned investigator, Detective Patricia Eberhart, out of the presence of the jury. (Id. at pgs. 17-22) No prosecutorial misconduct was detected. The Court determined the lack of production of this exhibit had been the result of an oversight. More importantly it was also admitted that both of the originating phones of the two messages at issue had always been retained by each owner, including Appellant. (Id. at pgs. 23-24)

Nevertheless, even though the defense argument that a *Brady* violation had occurred lacked validity and sufficient specificity, this Court properly initially remedied the late production with providing additional research time before proceeding. Further remedy was provided by agreement subsequently entered by counsel for both parties that the Commonwealth would not seek to introduce that exhibit is case in chief. (Id. at pgs. 22-25)

This Court identified the obvious caveat to this agreement that the defense would risk admission of the exhibit if the defense opened the door. Despite this advance warning, the defense opened the door to rebuttal admission by posing questions and eliciting responses that unfairly portrayed the misperception that no messages had ever been turned over to investigators by the victims' father. Additionally, the defense had introduced direct testimony from Appellant's wife following the close of the prosecution's case that invited rebuttal testimony from the victims' father and commensurate introduction of the exhibit reflecting the screen shot messages.

First and foremost, the appellate claim that a *Brady* violation had caused a denial of Appellant's due process protection was not legally or factually sound. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. The

-41-

Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, and that the duty encompasses impeachment evidence as well as directly exculpatory evidence. *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976), *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985).

The U.S. Supreme Court had further reasoned that "[s]uch evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375). Ultimately, the Supreme Court has held that there are three necessary components that demonstrate a violation of the Brady strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued. *Id.* at 281, 119 S.Ct. 1936.

> The Pennsylvania legislature promulgated Pa.R.Crim.P. 573 in response to *Brady*. See *Commonwealth v. Green*, 536 Pa. 599, 607, 640 A.2d 1242, 1246 (1994). That Rule provides that "in all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items... (a) Any evidence favorable to the accused which is material either to guilt or to punishment, and which is within the possession or control of the attorney for the Commonwealth."

Pa.R.Crim.P. [573](B)(1)(a).

Our appellate courts have further held that if a trial court deems that there has been a violation of Rule [573], it "may order [the offending] party to permit discovery or inspection, may grant a continuance, or may prohibit [the offending] party from introducing evidence not disclosed,

-42-

other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances." Pa.R.Crim.P. []573(E). *Commonwealth v. Capodieci*, 181 A.3d 431 (Pa. Super. Ct. 2017) quoting *Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136, 1141 (Pa. 2001).

In the instant matter, the exhibit at issue did not contain any data remotely favorable to the defense. To the contrary, it buttressed the testimony of the prosecution witnesses that Appellant had continuing unfettered access to both victims up to a few weeks before disclosure. It also lent credibility to the witness's recollection that the screen shot messages had been forwarded to the investigator consistent with the reported timeline. When asked whether she remembered where the screenshot came from, outside the presence of the jury, Detective Eberhart responded that "looking at it and seeing the dates, it had to be at the time when I met the parents at the PCA." (Id. at 18). Thus, that exhibit clearly did absolutely nothing to aid the defense. Nor did it prove or disprove whether Appellant had committed any crimes. The messages at issue simply reflected a request to take K.G. to a department store. Thus, the messages were immaterial to these cases.

Moreover, the remedies employed by this Court were reasonable at each stage. The first remedial response to the recovery and transfer of the screen shot messages was to conduct due inquiry and provide the defense additional time to research the piece of evidence. (N.T. 04/04/2018 pgs. 17-26). During the allotted time, the Commonwealth and defense reached an agreement that the Commonwealth would not use the evidence or refer to the text message during trial.

This Court subsequently ruled that the Commonwealth "may not use it in the Commonwealth's case, however, if the defense raises this issue and attempts to claim that [the text messages] did not exist, it then becomes ripe for rebuttal introduction." This Court also noted that "at the time this Defendant was arrested, the detectives did not confiscate the Defendant's phone or any of the phones at issue." (Id. at p. 24).

-43-

This Court correctly informed defense counsel that he may not unfairly argue that the detective didn't take a screenshot of the father's phone. (Id. at pgs. 24-29). Furthermore, this Court noted that Appellant "had access to his own phone, so he had access to what was sent or not sent, so actually, he had possession of the original information and still may have it. So, it's not a situation where it's solely in control of the Commonwealth." Consequently, this Court ruled that although the screenshot message legally "could come in to evidence," the Court would not permit its admission in the Commonwealth's case in chief because of the late notice. However, this Court did advise defense counsel that if he were to bring such issues to light, he would be opening the door to the information contained in the text message evidence and the Commonwealth would be permitted to introduce the evidence. (Id. at p. 29).

Subsequently during cross-examination of Detective Eberhart in front of the fact-finding jury, defense counsel asked the detective "In this particular case... you did not take anybody's phone, either the Defendant, complainants, or parents; is that fair to say?" (Id. at pgs. 51-52). After the defense had finished the first round of cross examination of the detective, this Court ruled on record, outside the presence of the jury, that defense "had opened up the door to explore the response" to the question he posed to the detective. (N.T. 04/04/2018 pgs. 58-62) Given the contextual unfair inference that no screenshot or phone had been examined or collected, this Court therefore allowed the limited identification of Commonwealth Exhibit #18 by Detective Eberhart in rebuttal. The detective was permitted only to identify the message as the screen shot messages sent to her by the victims' father. (Id. at pgs. 69-71)

Appellant's wife was called to testify following the close of the prosecution's case in chief. Within her testimony she insisted that her husband had zero contact with the victims after her argument with their mother. Her contradictory recollection of events certainly invited rebuttal from

-44-

the victims' father and introduction of the supporting screen shot messages. (N.T. 04/04/2018 pgs. 96-104) The victims' father I.G. was then correctly permitted to testify that he had recalled sending the screenshot of his phone to Detective Eberhart. The Commonwealth asked him to identify, authenticate and translate the messages. He testified that "he [the Defendant]said I'm just texting you to tell you if I could take K.G., if they would want to go to Sears Thursday after work, if you let them go" and he said his response read "I'll tell them when I get home." (Id. at p. 148). Defense counsel was permitted to fully cross-examine I.G. and Detective Eberhart as he had each individual witness presented by the Commonwealth throughout the trial.

Therefore, the admission of this single exhibit that presented immaterial information did not constitute a *Brady* violation nor did it cause any undue infringement of Appellant's due process or effective assistance of counsel. The remedies of this Court had been reasonably employed at each stage. Furthermore, even if the text messages had been erroneously admitted, no prejudicial or harmful effect had ensued.

The standard for determining harmless error was firmly established in *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (Pa. 1978) and its progeny. An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless. *Commonwealth v. Mitchell*, 576 Pa. 258, 280, 839 A.2d 202, 214 (2003).

In this case, the admission of the inculpatory text messages that Appellant had sent to the victims' father, a trial witness, could not have remotely contributed to the guilty verdicts. No proof of guilt or non-guilt could have been derived from the text messages that merely stated what I.G. had testified to at trial, namely, that Appellant had offered to take K.G. to a Sears department store.

-45-

Not only was the text message recipient a trial witness who could be cross-examined, but also the texts were in Spanish and there had been no translation initially admitted to evidence. Moreover, since Appellant had always retained the phone from which the message had originally been sent, he had possessed equal if not greater control of the data. Thus, this claim and its requested remedy lacked any factual and legal merit.

## V. Imposition of the Orders of Sentence constituted reasonable exercises of sentencing discretion.

Appellant recited five related appellate claims within the statement of alleged errors concerning this Court's imposition of the respective Orders and Judgement of Sentence. Essentially, Appellant claimed that the individual and aggregate sentences that had been imposed in both cases were manifestly excessive particularly because the sentences imposed consecutively as to each offense for which Appellant had been convicted as it related to each separate victim that he had harmed and as such unfairly effectuated a life of imprisonment. Incorporated within this claim was the previously raised claim that Appellant's stated age of fifty-five years and his character reputation should have accorded Appellant a shorter sentence. While it is true that the resulting aggregate number of years imposed for all crimes and both cases equates to an anticipated sentence of incarceration for the duration of Appellant's life expectancy, the respective sentences were justly imposed and well-deserved.

### A. Appellate Review of the Sentencing Court

Appellate review of this matter begins with the statutory prescription contained within 42 Pa. C.S.A. § 9781(b), directing that an appeal may be granted at the discretion of the appellate court only where it appears that there is a substantial question that the sentence imposed is not appropriate under this chapter. Thus, regarding the discretionary aspects of the sentencing, there is no automatic right to appeal. See *Commonwealth v. Cook*, 941 A.2d 7 (Pa. Super. 2007). The

-46-

Defendant does not have a valid claim of excessive sentence without including an additional and more specific violation of the sentencing code. Only when a sentencing claim sets forth the manner in which either a particular provision of the Sentencing Code or an underlying fundamental norm of the sentencing process was violated, does a claim of excessiveness present a substantial question. *Commonwealth v. Mouzon*, 812 A.2d 617, 620 (Pa. 2002). A blanket claim of excessiveness, with no further allegations, does not create a substantial question. *Id.*

Moreover, within this Commonwealth, the "imposition of a sentence is vested in the discretion of the sentencing court and will not be disturbed absent a manifest abuse of discretion." *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996). This standard reflects that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Ward*, 524 Pa. 48, 568 A.2d 1242, 1243 (1990). Consistent with this standard of record review, the appellate court shall have regard for: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and ... (3) the findings upon which the sentence was based." 42 Pa. C.S.A. § 9781 (d) (1) and (3).

As the instant record of the respective hearings conducted, this Court succinctly noted its thorough incorporation and evaluation of all relevant factors. Prior to the formal sentencing hearing, this Court had reviewed all submitted relevant sentencing materials including the mental health evaluation and the presentence investigative reports that had been previously ordered by this Court after the verdicts had been entered and the recommended sentencing guidelines promulgated by Pennsylvania Commission on Sentencing.

This Court incorporated the felony grading and offense gravity score of each offense. The parties acknowledged the Court's assessment that the lead first degree felony offenses had been

assigned an offense gravity score of fourteen (14) and that Appellant's prior record score was a zero. (N.T. 09/14/18, p. 9). This Court additionally identified its review of the Sentencing Memorandum submitted by the Commonwealth's counsel and the counselled mitigation packet submitted on behalf of Appellant which contained fourth-eight (48) character letters submitted predominantly by family members. At the sentencing hearing, this Court listened to mitigating arguments made by defense counsel, which included references to Appellant's strong ties to his community. The defense also argued that leniency should be extended because Appellant was fifty-five years of age. (Id. at pgs. 13-24).

This Court also listened to the prosecution's argument that referenced the tremendous amount of mental damage that Appellant had purposefully and frequently inflicted upon both of his very young nieces over a lengthy period of time. This Court was reminded also of Appellant's abuse of the trust that this family had placed in him. This Court recalled the significant toll that his remorseless conduct caused and the potential threat he had presented to the community, particularly children. (Id. at pgs. 26-29).

After acknowledging thorough consideration of all relevant sentencing factors, this Court succinctly recited in summary the sound rationale for the consecutive imposition of the respective sentences for each crime committed upon the two individually impacted child victims as follows:

> THE COURT: Mr. Arroyo, as everyone is well aware, I was the jurist that presided over this trial. And I can tell you after listening to the testimony that I heard and the jury accepted and found to be credible, trauma resulted every single day to everyone that heard it including me. The testimony that I heard was heart wrenching.
> Mr. Arroyo, it is my belief that the verdicts were absolutely correct and based upon sound evidence presented after a fair trial. The damage that this jury found that you have done sir, and that this Court also observed to these two lovely young children is immeasurable. The resulting damage to the family is immeasurable.
> You used your position within the community and your reputation and your offer of help to those that needed it as the method to groom these two little girls to

-48-

satisfy your sexual needs and wants without any regard to the damage that resulted therein. I am going to take that into account in my sentence. You have exhibited zero remorse for your actions. I'm going to take that into account in my sentences.

I'm going to take into account the guidelines at issue, the information that I have gleaned from the presentence investigative reports, and the mental health assessments and I'm going to take into account my determination that you constitute an extreme danger to children that come into your custody and control as these girls were permitted to do by their trusting parents. I'm going to take into account the significant and severe damage that you have done to them by corrupting them at the most base level.

In terms of the argument of whether or not my sentence will constitute a life sentence, I did not pick your age-you did-to conduct these crimes. For all of those reason and for reasons I will most certainly supplement the sentence that will be entered by this Court is as follows:

Under CP ending in 9217-2016 which lists the victim in this case as K.G., Count one Rape, felony of the first degree, the sentence of this Court is that you serve 10 years to 20 years state time incarceration.

Count two, involuntary deviate sexual intercourse, a child less than 16 years of age; the sentence is 10 to 20 years state time incarceration to run consecutively to count one.

Count four, aggravated assault indecent of a child, felony of the first degree; the sentence of this court is 10 to 20 years to run consecutively to counts one and two.

Count six, endangering the welfare of a child, the sentence of this court is that you serve three and one half to seven years state time incarceration to run consecutively to all other counts;

Count seven, corruption of the morals of a minor, felony of the third degree; the sentence of this court is that you serve a minimum of three and a half to seven years running consecutively to any and all other counts.

Thus far, the aggregate total under that CP number is 37 years through 74 years. I'll go over the conditions after I'm done with this.

As to CP-51-CR-0009218 of 2016, the victim is J.G. Count one, rape of a child, the sentence of this court is that you serve 10 years to 20 years state time incarceration.

Count two, involuntary deviate sexual intercourse, felony of the first degree, the sentence of this court is that you serve 10 years to 20 years state time incarceration running consecutively to count one.

Count five, endangering the welfare of a child, felony of the third degree; the sentence of this court is that you serve three and a half years to seven years state time incarceration running consecutively to other counts.

Count six, corruption of morals of minor, felony of the third degree the sentence of this court is that you serve three and a half years to seven years ste time incarceration running consecutively to all other counts.

Count 12, aggravated indecent assault of a child, the sentence of this court is that you serve 10 years to 20 years state time incarceration running consecutively to all other counts.

All counts under CP-51-Cr-0009218-2016 will be run consecutively tio all counts under 9247-2016. As to 9218-2016, the aggregate sentence for that case alone is 37 years to 74 years. Since that runs consecutively, sir, your total aggregate sentence is a minimum of 74 to 158 years state time incarceration…"

(N.T. 09/14/2018 pgs. 31-36)

This Court further imposed conditions of sentence, accorded credit for custodial time served and informed Appellant of the statutory lifetime registration and other requirements as a convicted SORNA Tier III Sexual Offender. This Court also corrected the calculated aggregate maximum for both cases and encompassing all counts to one-hundred forty-eight (148) years. (N.T. 09/14/2018 pgs. 36-45) Post verdict rights were properly provided to Appellant by his counsel.

The record demonstrated that this Court duly considered all relevant sentencing factors presented as they applied to each individual case. This Court as the presiding jurist had a front row seat to the overwhelming evidence that proved Appellant had committed multiple offenses upon not one but two separate children. The cumulative evidence clearly reflected that in actuality, Appellant had repeatedly committed each felony grade offence for which Appellant had been convicted during the span of five years. He acted purposefully with premeditation and without any care of consequences. To the contrary he remained remorseless.

Further, tremendous impact of Appellant's continuing predatory course of deviant conduct had upon the victims, his nieces, as well as the rippling harm upon the trusting members of their family was a driving sentencing factor. The resulting harm that Appellant had inflicted on his victims was "immeasurable." Even early on, the negative effects of his continuing criminal conduct was observable to the children's parents and to the interviewers and to the diagnosing and treating personnel. The behavioral and personality changes to each child particularly K.G., during these critical formative childhood years were documented.

-50-

Each child had been subjected to constantly feeling fear, helplessness, shame, isolation, confusion and loss of self-worth and control over their bodies. Dr. Maria McColgan's report of K.G.'s resulting suicidal thoughts were most reflective of traumatic stress that each child had experienced after being individually and dually attacked by Appellant.

As the presiding trial judge, this Court recalled the unique circumstances regarding Appellant's grooming methods. This Court noted that Appellant had manipulated his solid reputation and position within the community, particularly within his family to take advantage of his members as they attempted to adapt to their new home in Philadelphia. He sported a convincing facade as a trustworthy and kind individual to cultivate room these vulnerable and innocent young children to selfishly satisfy his sexual desires. Finally, this Court also measured Appellant's exhibition of zero remorse for his behavior. After voicing a thorough incorporation and evaluation of all relevant factors, this Court found that Mr. Arroyo poses a serious threat to the community, especially children in the future. In short, the individually imposed sentences as applied to each repeatedly committed offense and that addressed the harm done to separately impacted victims were warranted.

B. Appellate Review of Aggregation in Sentence

Similarly, pursuant to 42 Pa. C.S.A. § 9781(d)(1) and (3), this Court was well within its discretionary right to impose the sentences consecutively. The sentencing court's exercise of discretion by imposing consecutive as opposed to concurrent sentences is not viewed as raising a substantial question that would allow the granting of allowance of appeal in our Commonwealth. *Commonwealth v. Marts*, 889 A.2d 608 (Pa. Super. 2005).

In the instant matter, individualized consecutive standard sentences upon Appellant had been imposed only after careful consideration of all relevant sentencing factors including the

paramount need for the protection of the public, the gravity of the offense, and Appellant's poor prospect of rehabilitation. Imposition of consecutively running sentences for each offense and with respect to each case directly resulted from the overwhelming evidence that Appellant repeatedly committed each offense over the five-year period and that he targeted not one, but two of his very young nieces entrusted to his care to victimize. Further, the fact that he chose to harm these children when he was over fifty years old did not warrant a sentencing reduction. Thus, Appellant had not raised any substantial question that the consecutive sentences imposed had been inappropriate or contrary to a fundamental norm underlying the sentencing code.

Additionally, the weight given by the Court to the individual relevant sentencing factors is not a substantial question because this simply raised a disagreement about this Court's determination of facts and the weight of factors. Again, the sentencing court is given broad discretion in formulating a sentence, with no automatic right of review available. *Commonwealth v. Mastromarino*, 2 A.3d 581, 585 (Pa. Super. Ct. 2010). An appeal can only be granted if there is a substantial question as to a violation of a specific sentencing code or a fundamental norm. 42 Pa. C.S.A. § 9781; *Mouzon*, 812 A.2d at 627.

C. Appellate Review: Applying Standard of Abuse in Discretion

Even if the reviewing court found a substantial question, the sentencing court's determination can only be overturned for an abuse of discretion. *Commonwealth v. Walls*, 926 A.2d 957, 961 (Pa. 2007). Such an abuse is not just a mere disagreement, it must be "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will." *Id.* This standard is embodied in the language of section 9781(c), which dictates that when sentencing outside the guidelines, a sentencing court's determination must stand unless the sentence was unreasonable. 42 Pa. C.S.A. § 9781(c).

A sentence is reasonable when it includes examination of the public protection, the crime's gravity, and the defendant's rehabilitative needs, as listed in section 42 of the Pennsylvania Code. 42 Pa. Cons. Stat. Ann. § 9721 (West); *Walls*, 926 A.2d at 964. Additionally, when the sentencing court has reviewed a presentence report, it is presumed that the court has considered the information it contains. *Commonwealth v. Boyer*, 856 A.2d 149, 154 (Pa. Super. Ct. 2004) *aff'd* 891 A.2d 1265 (Pa. 2006). Facts can be considered, pursuant to §9721(b)'s sentencing requirements, even if the facts are subsumed within the guideline recommendation. *Commonwealth v. Sheller*, 961 A.2d 187, 192 (Pa. Super. Ct. 2008).

Per the statutory authority of our Commonwealth's duly elected legislature, this Court was imbued with the ability to levy the sentences as imposed. None of the imposed Orders and Judgments of Sentence had illegally surpassed the maximum period of confinement permitted by each applicable statute. Thus, this Court acted well within authorized sentencing discretion. As the instant record reflected, when sentencing Carlos Arroyo, this Court evaluated all sentencing factors and principally measured the gravity of Appellant's predatory conduct that entailed performance of hundreds of rapes and other forms of sexual assaults of two children and the potential danger that he had posed to future children within our community.

CONCLUSION

In reviewing the entire record, this Court finds no harmful, prejudicial, or reversible error. Accordingly, the Orders and Judgments of the trial court should be affirmed.

By the Court,

DATE: 5/12/2020

Anne Marie B. Coyle, J.

-53-